UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JESS TEDDER,<br><br>Defendant. | No. 1:07-cr-00162-NONE<br><br>ORDER DENYING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE<br><br>(Doc. No. 60) |

Pending before the court is defendant Jess Tedder's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). The motion is largely based on defendant's age, length of the term of imprisonment the defendant has already served, his medical condition, and the purported risks posed to him by the ongoing coronavirus ("COVID-19") pandemic. (Doc. No. 60.) For the reasons explained below, defendant's motion will be denied.

**BACKGROUND**

On October 5, 2009, defendant Tedder entered a plea of guilty to Count 3 of a Superseding Indictment charging him with the production of material involving the sexual exploitation of minors and aiding and abetting the same in violation of 18 U.S.C. §§ 2251(b) and 2. (Doc. Nos. 15 at 3; 54 at 3; 55.) The investigation of defendant Tedder by the U.S. Immigration and Customs Enforcement (ICE) commenced when agents learned that he was using

1

the internet to purchase and obtain images of child pornography.  Thereafter, ICE agents executed a search warrant of defendant's residence, recovering over 7,300 images of child pornography. (Presentence Report at 5–6.)[1]  Defendant involved his grandchildren in producing some of the illicit materials.  (*Id.* at 6.)  Defendant Tedder was arrested on these charges on June 12, 2007 (Doc. No. 2), was ordered temporarily detained, and thereafter was ordered detained without bail.  (Doc. Nos. 4, 6, 7.)  After his plea of guilty was entered on October 5, 2009, it was determined that under the U.S. Sentencing Guidelines defendant Tedder's adjusted offense level was 39 and his criminal history placed him in category I, resulting in an advisory sentencing guideline range calling for a term of imprisonment of between 262 and 327 months.  (Presentence Report at 19.)  The U.S. Probation Office recommended that a sentence of 262 months be imposed.  (*Id.*)  On December 7, 2009, the sentencing judge varied downward from the advisory guideline range and sentenced defendant to 210 months (17.5 years) in prison with a life term of supervised release to follow.  (Doc. Nos. 58; 59 at 2–3.)  Defendant has now served approximately 13 years and five months in prison, or almost 90% of his statutory sentence term when his earned good time credits are taken into account, and has an anticipated release date of May 10, 2022.  (Doc. No. 67-1 at 4.)

Defendant is currently serving his sentence at the U.S. Bureau of Prisons' ("BOP") Lompoc Federal Correctional Institute in Lompoc, California ("FCI Lompoc").  (Doc. No. 60 at 11.)  On September 25, 2020, defendant filed the pending motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A).  (Doc. No. 60.)  On October 14, 2020, the government filed its opposition to the motion, and on October 20, 2020, defendant filed his reply thereto.  (Doc. Nos. 67, 72.)

**LEGAL STANDARD**

A court generally "may not modify a term of imprisonment once it has been imposed."  18 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not

---

[1] At the time of defendant Tedder's sentencing in 2009, presentence reports were not filed on the court's public docket.  Therefore, the undersigned has obtained a copy of the presentence report in defendant's case from the U.S. Probation Office and has relied in part upon that document in summarizing the background of defendant's prosecution, guilty plea, and sentencing.

be modified by a district court except in limited circumstances."). Those limited circumstances include compassionate release in extraordinary cases. *See United States v. Holden*, 452 F. Supp. 3d 964, 968 (D. Or. 2020). Prior to the enactment of the First Step Act of 2018 ("the FSA"), motions for compassionate release could only be filed by the BOP. 18 U.S.C. § 3582(c)(1)(A) (2002). Under the FSA, however, imprisoned defendants may now bring their own motions for compassionate release in the district court. 18 U.S.C. § 3582(c)(1)(A) (2018). In this regard, the FSA specifically provides that a court may

> upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf[2] or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that –
>
> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission [.]

18 U.S.C. § 3582(c)(1)(A)(i) and (ii).[3]

---

[2]  If the BOP denies a defendant's request within 30 days of receipt of such a request, the defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the date the Warden signed the response." 28 C.F.R. § 542.15(a). If the Regional Director denies a defendant's administrative appeal, the defendant must appeal again to the BOP's "General Counsel within 30 calendar days of the date the Regional Director signed." *Id.* "Appeal to the General Counsel is the final administrative appeal." *Id.* When the final administrative appeal is resolved, a defendant has "fully exhausted all administrative rights." *See* 18 U.S.C. § 3582(c)(1)(A).

[3]  Under 18 U.S.C. § 3624(c)(2), the BOP may release an incarcerated defendant to home confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6

The applicable policy statement with respect to compassionate release in the U.S. Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and compelling reasons."  U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13[4]; *see also United States v. Gonzalez*, 451 F. Supp. 3d 1194, 1197 (E.D. Wash. 2020) (noting that courts "universally" rely on U.S.S.G. § 1B1.13 to define "extraordinary and compelling reasons," even though that policy statement was issued before Congress passed the FSA and authorized defendants to file compassionate release motions).  However, a large and growing number of district courts across the country have concluded that because the Sentencing Commission has not amended the Guidelines since the enactment of the FSA, courts are not limited by the pre-FSA categories described in U.S.S.G. § 1B1.13 in assessing whether extraordinary and compelling circumstances are presented justifying a reduction of sentence under 18 U.S.C. § 3582(c).  *See, e.g.*, *United States v. Parker*, 461 F. Supp.3d 966, 978–79 (C.D. Cal. 2020) (collecting cases);

---

months."  The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), Pub. L. 116-136, expands the BOP's authority to release incarcerated defendants without judicial intervention.  The CARES Act allows the BOP to "lengthen the maximum amount of time" for which a prisoner may be placed in home confinement under § 3624(c)(2) "as the Director determines appropriate," assuming "the Attorney General finds that emergency conditions will materially affect the functioning" of the BOP.  CARES Act, Pub. L. 116-136, Div. B, Title II, § 12003(b)(2) (2020).  However, the BOP's authority in this regard is limited to "the covered emergency period."  *Id.*  The BOP's authority expires "30 days after the date on which the national emergency declaration terminates." *Id.* § 12003(a)(2).  After the CARES Act was enacted, the Attorney General issued a memo instructing the BOP to "immediately review all inmates who have COVID-19 risk factors" beginning with those who are housed at facilities where "COVID-19 is materially affecting operations."  Office of Att'y Gen., *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020).  The BOP has acted on the Attorney General's guidance, including one case in which a sentenced prisoner was released to home confinement after serving less than half his sentence from a facility that reported no positive COVID-19 cases at the time of his release.  *See* Hannah Albarazi, *Paul Manafort Seeks Prison Release Over COVID-19 Fears*, LAW360 (Apr. 14, 2020), https://www.law360. com/articles/1263706/paul-manafort-seeks-prison-release-over-covid-19-fears (noting that the prisoner's counsel had argued that the CARES Act "broadens the authority" of the BOP to release prisoners to home confinement); Khorri Atkinson, *Paul Manafort Released From Prison Amid COVID-19 Fears*, LAW360 (May 13, 2020), https://www.law360.com/articles/1273090/paul-manafort-released-from-prison-amid-covid-19-fears.

[4]  The Sentencing Guidelines also require that to be granted a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).

1  *United States v. Rodriguez*, 424 F. Supp. 3d 674, 681 (N.D. Cal. 2019).

2  In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the defendant bore the initial burden of demonstrating that a sentence reduction was warranted. *See United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998). Although the Ninth Circuit has not specifically addressed the question of which party bears the burden in the context of a motion for compassionate brought pursuant to § 3582(c) as amended by the FSA, district courts that have done so have agreed that the burden remains with the defendant. *See, e.g.*, *United States v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020); *United States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, at *3 (W.D. Wash. May 7, 2020).

## ANALYSIS

As district courts have summarized, in analyzing whether a defendant is entitled to compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a defendant has satisfied three requirements:

> First, as a threshold matter, the statute requires defendants to exhaust administrative remedies. 18 U.S.C. § 3582(c)(1)(A). Second, a district court may grant compassionate release only if "extraordinary and compelling reasons warrant such a reduction" and "that such reduction is consistent with applicable policy statements issued by the Sentencing Commission. *Id.* Third, the district court must also consider "the factors set forth in Section 3553(a) to the extent that they are applicable." *Id.*

*Rodriguez*, 424 F. Supp. 3d at 680; *see also United States v. Ramirez-Suarez*, 16-CR-00124-LHK-4, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020); *Parker*, 461 F. Supp. 3d at 973–74; *United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9, 2020) (noting that as to the third factor, under 18 U.S.C. § 3582(c)(1)(A) release must be "consistent with" the sentencing factors set forth in §3553(a)).

**A.   Administrative Exhaustion**

According to defendant Tedder, "[i]n the second week" of May 2020, he submitted an administrative request to the Warden at FCI Lompoc seeking compassionate release based on his age and health conditions. (Doc. No. 60-1 ¶ 7.) The court notes that defendant has not attached a

5

1  copy of his administrative request to the pending motion  The government states that defendant
2  submitted an administrative request sometime in May 2020.  (Doc. No. 67 at 4.)  On June 16,
3  2020, the Warden denied defendant's administrative request for compassionate release.  (Doc.
4  No. 60-2.)  Defendant appears to have exhausted his administrative remedies because he filed the
5  pending motion for compassionate release after submitting a request to the Warden and waiting
6  more than 30 days without receiving a response.  Moreover, the government agrees that
7  exhaustion is satisfied.  (Doc. No. 67 at 4.)  Because a failure to exhaust administrative remedies
8  is normally viewed as an affirmative defense, the government's concession on this point will be
9  accepted.  Below, the court will address the merits of defendant's motion.

**B.     Extraordinary and Compelling Reasons**

"Extraordinary and compelling reasons" warranting compassionate release may exist based on a defendant's medical conditions, age and other related factors, family circumstances, or "other reasons." U.S.S.G. § 1B1.13, cmt. n.1 (A)–(D).  Even though the catch-all of "other reasons" was included in the policy statement at a time when only BOP could bring a compassionate release motion, courts have agreed that it may be relied upon by defendants bringing their own motions under the FSA.  *See, e.g.*, *United States v. Kesoyan*, No. 2:15-cr-236-JAM, 2020 WL 2039028, at *3–4 (E.D. Cal. Apr. 28, 2020) (collecting cases).

Thus, the medical condition of a defendant may warrant compassionate release where he or she "is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required." U.S.S.G. § 1B1.13, cmt. n.1 (A)(i).  Non-exhaustive examples of terminal illnesses that may warrant a compassionate release "include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." *Id.*  In addition to terminal illnesses, a defendant's debilitating physical or mental condition may warrant compassionate release, including when:

> The defendant is
>
> (I)   suffering from a serious physical or medical condition,
>
> (II)  suffering from a serious functional or cognitive impairment, or

> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* at cmt. n.1 (A)(ii). Where a defendant has moderate medical issues that otherwise might not be sufficient to warrant compassionate release under ordinary circumstances, some courts have concluded that the risks posed by COVID-19 tips the scale in favor of release in particular situations. *See, e.g.*, *United States v. Rodriguez*, 451 F. Supp. 3d 392, 405–06 (E.D. Pa. 2020) ("Without the COVID-19 pandemic—an undeniably extraordinary event—Mr. Rodriguez's health problems, proximity to his release date, and rehabilitation would not present extraordinary and compelling reasons to reduce his sentence. But taken together, they warrant reducing his sentence.").

Compassionate release may also be warranted based on a defendant's age and other related factors. In these situations, "extraordinary and compelling reasons" exist where a "defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." U.S.S.G. § 1B1.13, cmt. n.1(B). In determining a defendant's projected release date, courts may take into account any "good time credits" awarded to the defendant by BOP for "exemplary" behavior in prison as set forth in 18 U.S.C. § 3624(b)(1). *See, e.g.*, *United States v. Burrill*, 445 F. Supp. 3d 22, 24 n.1 (N.D. Cal. Apr. 10, 2020).

Here, defendant Tedder first argues that extraordinary and compelling reasons warranting his compassionate release exist due to his age and age-related factors. As recognized above, to qualify for release under this policy statement a defendant must demonstrate that he is at least 65 years old, has served at least 10 years or 75% of his term of imprisonment, and "is experiencing a serious deterioration in physical or mental health because of the aging process." *See* U.S.S.G. § 1B1.13, cmt. n.1(B). Defendant Tedder is 65 years old (*see* Presentence Report at 2) and has served over 13 years in prison, which is over 75% of his total sentence, and nearly 90% of his

1  statutory sentence term when accounting for his good time credits.  (Doc. No. 67-1 at 4.)  Thus, in
2  deciding whether extraordinary and compelling reasons exist justifying compassionate release
3  based on this policy statement, the remaining issue in this case is whether defendant Tedder "is
4  experiencing a serious deterioration in physical or mental health because of the aging process."
5  *See* U.S.S.G. § 1B1.13, cmt. n.1(B).

6  Defendant argues that his debilitating seizures, migraine headaches, and his weight gain
7  demonstrate that his physical health is deteriorating due to his age.  (Doc. No. 60 at 14.)  He
8  argues that his age also places him at greater risk from COVID-19.  (*Id.*)  The court notes that
9  prior to sentencing in this case in December of 2009, "defendant did not report any health-related
10 issues and stated that he has never suffered from any chronic illness."  (Presentence Report at 13.)
11 Defendant further stated that he was not taking any medication nor was he under the regular care
12 of a physician at that time.  (*Id.*)  In February 2019, many years after defendant began serving his
13 prison sentence, a BOP medical staff member noted that defendant reported suffering from
14 seizures and migraine headaches.  (Doc. No. 65 at 10 (sealed).)  At that time, it was
15 recommended that defendant see a neurologist because he was suffering from "[c]omplex seizure
16 activity."  (*Id.* at 12.)  It was also recommended that defendant undergo an electroencephalogram,
17 commonly known as an EEG, which—as the court understands it—is a diagnostic test used to
18 evaluate electrical activity among brain cells and, presumably, would shed light on defendant's
19 seizures.  (*Id.*)  However, in June 2019, that diagnostic test was administered, and BOP medical
20 staff reported that defendant's EEG was "[n]ormal" with no "seizure activity."  (*Id.* at 5.)
21 Defendant was also not reporting that he was suffering any headaches at that time.  (*Id.*)  In
22 November 2019, it was noted again that a physician "confirmed that [defendant] has no seizure[]
23 activities," and appeared "stable."  (*Id.* at 2.)  Neither party has submitted to the court any other
24 evidence or documentation squarely addressing defendant's purported seizure condition, dated
25 any more recently than November 2019.

26 Based upon the medical record before the court, defendant Tedder does not appear to be
27 currently suffering "debilitating seizures."  While defendant appears to have suffered some
28 seizures in the past, the most recent medical update reflects that he no longer shows signs of

8

"seizure[] activities" and has been deemed "stable" by BOP medical staff.[5] (Doc. No. 71 at 3 (sealed).) In reply, defendant states that this later BOP medical record "was a snapshot in time and does not rule out that Mr. Tedder has continually complained of suffering from seizures" as early as October 2018. (Doc. No. 72 at 3.) The court does not doubt that defendant—before the start of the COVID-19 pandemic—suffered from seizure-related medical issues, whether he suffered from multiple seizures as he claims, or he had seizure activity in his brain as the BOP medical staff documented. The BOP's medical staff recommended that an EEG be administered, which came back with normal results. (*Id.* at 4.) While defendant argues that "seizure activity can be incredibly difficult to definitively diagnose," it remains his burden to satisfy the elements for compassionate release. (*See id.*) It would defy logic for the court to conclude that defendant suffers from "a serious deterioration in . . . health" based on a condition that he once suffered from but now, according to the most recent BOP medical records, appears to have been resolved. *See* U.S.S.G. § 1B1.13, cmt. n.1(B). But even if the court made that logical jump and concluded defendant is experiencing "a serious deterioration in . . . health," the court is not persuaded that defendant's seizures are "because of the aging process." *See id.* For example, young children suffer from seizures. *See Epilepsy in Schools*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/epilepsy/groups/schools.htm (last visited Nov. 20, 2020) (stating that "[n]ationwide, about 470,000 children have epilepsy"). Defendant does not provide any support for the argument that seizures generally are a condition of aging, or even that defendant's seizures in particular are due to his aging. (*See passim* Doc. No. 60.) Therefore, defendant has not demonstrated extraordinary and compelling reasons based on his age and age-related factors.

In addition to his age and age-related factors, defendant argues that he has established extraordinary and compelling based on his medical conditions alone. (Doc. No. 60 at 15.) To qualify under this policy statement, defendant must show that he is suffering from some "serious" medical condition "that substantially diminishes [his] ability . . . to provide self-care" in FCI

---

[5] Defendant refused to take prescription medication for his seizures because, as defense counsel explains it, defendant "wants to determine the root cause of these issues, and not simply put a Band-Aid on them." (Doc. Nos. 60 at 17; 65 at 10 (sealed).)

Lompoc and the medical condition is one "from which he . . . is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.1 (A)(ii). Aside from his seizures which the court discussed above, defendant cites his age, weight, and the associated risks to him were he to contract COVID-19 as grounds for his compassionate release. (Doc. No. 60 at 18–23.) According to the U.S. Centers for Disease Control and Prevention ("CDC"), defendant is not obese because his body mass index (BMI) is below 30, although he is overweight because his BMI is over 25. (*Id.* at 13 (stating defendant's BMI is 27.1 as of June 2019).) *See Coronavirus Disease 2019 (COVID-19): People Who Are at Increased Risk for Severe Illness*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last visited Nov. 20, 2020). As defense counsel notes, the CDC recently revised its guidance to include individuals with a BMI greater than 25 but less than 30 (i.e., those who are overweight but not obese) as potentially being at risk from suffering a severe illness if they contract COVID-19. *Id.* (stating that individuals with a BMI greater than 25 but lower than 30 "may" be at risk, while individuals with BMIs greater than 30 are in fact at risk of contracting a severe illness from COVID-19). Therefore, defendant's weight may make him more susceptible to a severe illness from the virus. *See id.* Additionally, defendant might be at higher risk of contracting a severe illness because he is 65 years old. *See id.* (stating that "people in their 60s or 70s are, *in general*, at higher risk for severe illness than people in their 50s" (emphasis added)). Last, the court rejects defendant's argument that his gender puts him at greater risk, as that is not an at-risk category according to the CDC. *See id.* (Doc. No. 60 at 19–20 (arguing COVID-19 kills more men than women "[f]or unknown reasons").)

      The evidence before the court, supporting the contention that defendant Tedder is at risk of becoming severely ill were he to contract COVID-19, is speculative. Defendant tested positive for COVID-19 on about May 6, 2020, but was listed as asymptomatic and it does not appear that he suffered from any side effects as a result of the virus. (Doc. Nos. 66 at 13 (sealed); 71 at 2 (sealed).) For about two weeks after his positive test result, defendant did not display any of the common COVID-19 symptoms, including a cough, shortness of breath, muscle pain, fatigue, sore

/////

throat, headaches, new loss of taste or smell, or chills.  (Doc. No. 71 at 5–6 (sealed).)[6] Nonetheless, defendant states that the possibility of reinfection weighs in favor of granting his compassionate release.  (Doc. No. 60 at 20.)  In this regard, many courts have "err[ed] on the side of caution to avoid potentially lethal consequences" because "the science is unclear on whether reinfection is possible."  *United States v. Yellin*, No. 3:15-cr-3181-BTM-1, 2020 WL 3488738, at *13 (S.D. Cal. June 26, 2020) (finding extraordinary and compelling reasons exist where a COVID-positive inmate at FCI Terminal Island, who did not develop severe symptoms, suffered from a combination of medical conditions that placed him at risk of serious complications from COVID); *see also United States v. Hanson*, No. 6:13-cr-00378-AA-1, 2020 WL 3605845, at *4 (D. Or. July 2, 2020) ("[T]here is no current scientific evidence to indicate that a 'recovered' COVID-19 patient is immune from reinfection, as several courts have recently acknowledged. . . . [T]he Court remains concerned about FCI Terminal Island's ability to provide adequate care in light of defendant's complex medical needs.  The Court is not convinced that FCI Terminal Island has been successfully mitigating the risk of reinfection, given the high numbers of infected inmates and Defendant's own contraction of the virus.").  Other courts have taken the position that uncertainty surrounding the danger of reinfection "cuts against compassionate release," in part because it is the defendant's burden to establish that "extraordinary and compelling reasons" justifying the granting of that relief.  *See United States v. Molley*, No. CR15-0254-JCC, 2020 WL 3498482, at *3 (W.D. Wash. June 29, 2020).

      Here, even if the court assumed there was some possibility of defendant's reinfection, that risk combined with his age and weight alone provide an insufficient basis upon which to conclude that he suffers from a "serious" medical condition for purposes of compassionate release.  *See* U.S.S.G. § 1B1.13, cmt. n.1 (A)(ii).  Defendant has not cited any case in which compassionate release has been granted for an inmate in the same or similar physical condition as defendant Tedder.  In addition, defendant has failed to demonstrate that his medical conditions

---

[6] In his reply defendant states that he was "not asymptomatic" because "[h]e suffered from extreme headaches, which could have been due to his underlying neurological condition and/or COVID-19."  (Doc. No. 60 at 20.)  Defendant does not, however, cite any medical evidence in support of his contention that he was "not asymptomatic" as indicated in his medical records.

11

1  "substantially diminish[] [his] ability . . . to provide self-care" in FCI Lompoc.  *See id.*  With

2  respect to his purported inability to provide self-care, defendant relies heavily on the alleged

3  conditions at FCI Lompoc.  (Doc. No. 60 at 23–29.)  It is true that FCI Lompoc suffered from a

4  significant COVID-19 outbreak, with 702 inmates and 19 staff who tested positive but recovered,

5  while two inmates died at the hands of the virus.  *See COVID-19*, FEDERAL BUREAU OF PRISONS,

6  https://www.bop.gov/coronavirus/ (last visited Nov. 20, 2020).[7]  At this time, however, there are

7  currently zero inmates and zero staff at FCI Lompoc who are being reported by the BOP as

8  having active cases of COVID-19.[8]  *Id.*  Because it appears that current active cases among

9  prisoners at FCI Lompoc have been reduced to zero, adding COVID-19 to the equation thus does

10  not tip the scales in favor of defendant's compassionate release.  More to the point, defendant

11  Tedder has not pointed to any concrete evidence demonstrating that he is "substantially

12  diminishe[d]" in providing "self-care."  *See* U.S.S.G. § 1B1.13, cmt. n.1 (A)(ii).  Nothing

13  currently in the record before this court shows that defendant is actually struggling to take care of

14  himself while in prison.  Although defense counsel has submitted a declaration detailing the

15  purported difficulties defendant suffers from, (Doc. No. 60-1 ¶ 5), medical documentation from

16  the BOP, submitted by both defendant and the government in connection with the pending

17  motion, tells a different story.  The court observes that as of April 2019, a BOP medical staff

18  member noted that defendant appeared "[w]ell, [a]lert and [o]rientated[.]" (Doc. No. 65 at 7

19  (sealed).)  And, for the reasons discussed above, defendant's seizure-related issues appear to be

20  resolved.  As a result, the court is unable to find that defendant is unable to provide himself with

21  adequate care while incarcerated at FCI Lompoc.  Furthermore, defendant appears to be receiving

22  proper care from BOP's medical staff (e.g., the administration of the EEG), even though he

23  declined to take prescribed medications in connection with his seizure condition.  (*See* Doc. Nos.

---

[7] FCI Lompoc has a population of 945 inmates.  *FCI Lompoc*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/lof/ (last visited Nov. 20, 2020).

[8] While the undersigned does not necessarily accept these reported numbers at face value in light of current CDC guidelines with respect to both testing and the manner of counting "active cases" without requiring retesting to confirm that the individual can be considered "recovered," there is also no evidence before the court challenging those reported numbers in this case.

72 at 4; 65 at 10 (sealed).)  While there is still some unknown risk to defendant due to the possibility that he could be reinfected with COVID-19, that speculative possibility provides no basis upon which the court could conclude that defendant is "substantially diminishe[d]" in his ability to "provide self-care" at FCI Lompoc.  *See* U.S.S.G. § 1B1.13, cmt. n.1 (A)(ii).  Thus, defendant Tedder has failed to carry his burden in this regard.  *See Greenhut*, 2020 WL 509385, at *1 ("The defendant bears the initial burden to put forward evidence that establishes an entitlement to a sentence reduction.").

Therefore, in this case, the court does not find extraordinary and compelling reasons justifying compassionate release pursuant to § 3582(c)(1)(A).

### C.     Consistency With the § 3553(a) Factors

Because the pending motion fails to establish extraordinary and compelling reasons justifying compassionate release in this case, the court need not address whether any reduction in defendant's sentence would be consistent with consideration of the sentencing factors set forth at 18 U.S.C. § 3553(a).

### CONCLUSION

For the reasons explained above, defendant's motion for compassionate release (Doc. No. 60) is denied.

IT IS SO ORDERED.

Dated:  **November 21, 2020**                    /s/ Dale A. Drozd
                                                 UNITED STATES DISTRICT JUDGE